# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

Civil Action No.:    1:23-cv-_____

DIANE DOUMIT, RN,

    Plaintiff,
     v.

ARAPAHOE MEDICAL INVESTORS, LLC
d/b/a LIFE CARE CENTER OF AURORA
and  LIFE CARE CENTERS OF AMERICA, INC.

    Defendants.

_____

## CIVIL COMPLAINT AND JURY DEMAND
_____

The Plaintiff, Diane Doumit, RN by and through her legal counsel, CONDUIT LAW, LLC, hereby submits the following Civil Complaint and Jury Demand and asserts:

## JURISDICTION AND VENUE

1.    At all times relevant to this action, Plaintiff Diane Doumit, RN (hereinafter, "Plaintiff") resided in Colorado.

2.    At all times relevant to this action, Arapahoe Medical Investors, LLC d/b/a Life Care Center of Aurora ("Defendant AMI") was and is a Tennessee limited liability company licensed to do business in the State of Colorado.  Defendant AMI maintains a principal place of business at 3570 Keith St. NW, Cleveland, TN 37312.  Defendant AMI maintains a registered agent in the State of Colorado: Corporation Service Company, 1900 W. Littleton Boulevard, Littleton, CO 80120.

3. At all times relevant to this action, Defendant Life Care Centers of America, Inc. ("Defendant Life Care Centers of America") is a Tennessee corporation licensed to do business in the State of Colorado. Defendant Life Care Centers of America maintains a principal place of business at 3570 Keith St. NW, Cleveland, TN 37312. Defendant Life Care Centers of America maintains a registered agent in the State of Colorado: Corporation Service Company, 1900 W. Littleton Boulevard, Littleton, CO 80120.

4. Upon information and belief, Defendant AMI, which owns, manages, and operates Life Care Center of Aurora, is a wholly-owned subsidiary of Defendant Life Care Centers of America.

5. At all relevant times, both Defendant AMI and Defendant Life Care Centers of America (collectively, "Defendants") purposefully availed themselves of the privilege of doing business in the State of Colorado.

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is a civil action in which the parties are citizens of different states. Specifically, as a result of being terminated in violation of public policy, Plaintiff has suffered extensive economic damages including loss of wages and noneconomic damages including damage to reputation and emotional harm.

7. Venue is proper in the U.S. District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b) as this is a District in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

## FACTUAL ALLEGATIONS

8. At the time of her termination from Life Care Center of Aurora, Plaintiff was a 68-year-old Registered Nurse with over 40 years of professional experience caring for the most disabled of patients.

9. At the time of her termination, Plaintiff maintained a spotless professional and disciplinary record, including with all state regulatory agencies and at every employer, including at Life Care Center of Aurora.

10. Plaintiff began working for Defendants on a contract basis on or about April 15, 2022.

11. Plaintiff worked in numerous areas at Life Care Center of Aurora, including on its long-term care units and its Skilled Unit.

12. On or about June 15, 2022, Plaintiff applied for full-time employment at Life Care Center of Aurora.

13. On or about July 6, 2022, Plaintiff obtained full-time employment at Life Care Center of Aurora.

14. As alleged above, Life Care Center of Aurora, despite being physically located in Aurora, Colorado, is, upon and information, owned and operated by Defendant AMI.

15. As alleged above, Defendant AMI is, upon information and belief, a wholly-owned subsidiary of Defendant Life Care Centers of America, as both entities maintain the identical principal place of business in Cleveland, Tennessee.

16. Accordingly, on or about July 6, 2022, Plaintiff became a full-time employee of Defendants.

17. As she had prior to becoming a full-time employee, after gaining full-time employment, Plaintiff worked four shifts per week – generally, Friday, Saturday, Sunday, and Monday – at Life Care Center of Aurora.

18. Plaintiff's bi-weekly compensation after gaining full-time employment with Defendants averaged approximately $2,750.

19. At the time she worked as an independent contractor through the Nursa Staffing Company, Plaintiff was supervised at Life Care Center of Aurora by the facility's Skilled East Unit Manager Menderin Abegaz and Director of Nursing Val Veraldi.

20. In or about early August 2022, and approximately one month after Plaintiff began full-time employment with Defendants, three individuals transferred from another facility owned by Defendants, Hallmark Nursing Home, to Life Care Center of Aurora: Deborah A. Barnes, Life Care Center of Aurora's new Executive Director, Eliza Moeller, a new Staff Nurse at Life Care Center of Aurora, and Angie Orthoud, a new Staff Development Coordinator at Life Care Center of Aurora.

21. Upon information and belief, at the time of their transfer from Hallmark Nursing Home to Life Care Center of Aurora, Administrator Barnes maintained a longstanding personal and professional relationship with RN Moeller.

22. Upon information and belief, prior to her transfer to Life Care Center of Aurora, Director Barnes recruited RN Moeller to transfer to Life Care Center of Aurora as well.

23. After transferring to Life Care Center of Aurora, RN Moeller almost immediately instigated and was involved in at least two incidents in which she became belligerent with and hostile towards two different patients and members of their families, both of which were serious enough to result in RN Moeller being suspended at least twice.

24. After each of RN Moeller's two known suspensions, she was immediately back at work the following days without ever being reported to the Aurora Police Department, Adult Protective Services, or the Colorado Board of Nursing.

25. These two incidents were in addition to the sudden and unexpected death of a new admission assigned to RN Moeller on November 25, 2022, who had to be transported to a local hospital where she died later that night after hitting her head during an unwitnessed fall at Life Care Center of Aurora.

26. At least two of these three known incidents involving RN Moeller occurred during her 90-day new employee probationary period.

27. Upon information and belief, RN Moeller received either minimal or no disciplinary action after the sudden and unexpected death of the new admission assigned to her on November 25, 2022, which was the day immediately preceding Plaintiff's November 26, 2022 suspension and eventual termination.

28. Upon information and belief, the main reason why RN Moeller was either minimally disciplined or not disciplined at all was the longstanding personal and professional relationship between RN Moeller and Administrator Barnes.

29. Upon information and belief, RN Moeller was also only either minimally disciplined or not disciplined at all because Administrator Barnes misused her position of power and relationship with RN Moeller to coerce others into withholding information regarding RN Moeller's liability in these incidents.

30. RN Moeller also engaged in questionable and implicitly discriminatory behavior during her employment at Life Care Center of Aurora, including talking down to Nurse Aides of African descent and condescendingly correcting how these staff members pronounced American English words.

31. As above, Administrator Barnes, then-Staff Development Coordinator Leia Blackwood, and Human Resources Director Andrea Landaverry failed to discipline RN Moeller for this discriminatory behavior.

32. Finally, in addition to becoming belligerent with and hostile towards patients and their families, neglecting patient safety which resulted in the death of a patient, and discriminating against other employees of Defendants, RN Moeller engaged in otherwise extremely unprofessional behavior, including incidents involving Plaintiff.

33. Plaintiff reported the above conduct to her supervisors at Life Care Center of Aurora at least *four* times:

• **August 29, 2022**: Plaintiff communicates via text messages and phone calls with Skilled East Unit Manager Menderin Abegaz and Staffer Cherie Banks regarding RN Moeller's conduct;

• **September 30, 2022**: Plaintiff again communicates via text messages and phone calls with Unit Manager Menderin Abegaz and Staffer Cherie Banks regarding RN Moeller's conduct;

• **October 1, 2022**: Plaintiff communicates with Director of Nursing Val Veraldi regarding RN Moeller's conduct; and

• **October 3, 2022**: Plaintiff meets with a team at Life Care Center of Aurora, including then-Staff Development Coordinator Leia Blackwood, Human Resources and Payroll Director Andrea Landaverry, and Staffer Cherie Banks regarding RN Moeller's conduct.

34. During this final October 3, 2022 meeting, Plaintiff repeatedly expressed fear of retaliation by Administrator Barnes in response to Plaintiff's complaints about RN Moeller given the longstanding personal and professional relationship between Administrator Barnes and RN Moeller.

35. Indeed, only weeks after Plaintiff vocalized her very first complaint about RN Moeller on August 29, 2022, Administrator Barnes began retaliating against Plaintiff for complaining.

36. This retaliation included, though was not limited to:

• **September 29, 2022**: Administrator Barnes falsely telling Director of Nursing Veraldi that Plaintiff never returned a call Administrator Barnes made to Plaintiff;

• **October 1, 2022** Administrator Barnes falsely telling Plaintiff that the only grounds for a new employee benefits enrollment deadline appeal was a health event or family death, when there were in fact other grounds for an appeal for which Plaintiff qualified, including not

receiving from Human Resources Director Andrea Landaverry or from then-Staff Development Coordinator Leia Blackwood website login instructions or information about benefits options or the enrollment deadline date; and

- **October 1, 2022**: Administrator Barnes intentionally failing to process Plaintiff's benefits appeal, resulting in Plaintiff working without benefits and having to wait at least three months in order to receive such benefits.

37. On November 26, 2022, while working a normally scheduled shift at Life Care Center of Aurora, Social Services Director Lindsay Cristobal approached Plaintiff and informed her that a patient for whom Plaintiff was caring had alleged that Plaintiff "raped her."

38. Plaintiff had been caring for the patient, a 79-year-old woman, who purportedly made this false allegation, for approximately one month prior to the patient purportedly making this false allegation.

39. The patient who purportedly made the false allegation had a known and long psychiatric history which included anxiety and depression diagnoses. The patient also refused to take her psychiatric medications.

40. The patient who purportedly made this false allegation also had two recent non-psychiatric diagnoses which are also known to cause confusion and memory issues, especially in the elderly.

41. After the patient initially alleged during the day shift of November 26, 2022 that her husband had been beating her, her husband then alleged that she told him that "someone" removed her clothes the night *prior*, when Plaintiff was not working. At the time the patient's husband initially reported this, the patient had not told anyone, including any employee of Defendants, that anyone had removed her clothing, including when these employees were later questioned by facility staff. Additionally, two head-to-toe skin assessments did not reveal any evidence of sexual or physical

assault. The patient's husband later confirmed to the Aurora Police Department investigating officer that there were "no claims of sexual assault."

42. Upon information and belief, Life Care Center of Aurora employees relentlessly interrogated the patient for at least four hours between 12 p.m. and 4 p.m. on November 26, 2022 regarding her purported allegation, even though the patient had known psychiatric issues, including anxiety for which she had refused ordered psychiatric medications that day and intermittently throughout the prior week.

43. Upon information and belief, the majority of the patient's statements revolved around her husband, who she alleged physically assaulted her and was stealing her money.

44. Upon information and belief, although the skin assessment performed on patient by Plaintiff on November 25, 2022 did not involve Plaintiff touching her and instead was done while Plaintiff happened to be in patient's room talking to patient's husband while examining the patient's skin as nurse aides were changing her, it would not have been unusual for Plaintiff or any staff member to undress and re-dress patient given patient's documented history of urinary incontinence and that day shift and evening shift nurses were required to perform skin assessments on assigned patients each and every shift.

45. Upon information and belief, the patient never directly or indirectly accused Plaintiff of sexual or physical assault or said that Plaintiff "raped" her.

46. Indeed, Plaintiff's interactions with the patient on the day the patient purportedly alleged that Plaintiff "raped" her were both extremely limited and, when they did occur, were always in the presence of others, making it impossible for Plaintiff to have sexually assaulted her or to have hurt her by being "rough" with her.

47. After being presented with the allegations, Plaintiff spent nearly two hours drafting a handwritten statement in which she denied the "rape" allegation and detailed the reasons for such

denial.

48.     After submitting the statement, Social Services Director Lindsey Cristobal escorted Plaintiff off the property.

49.     Social Services Director Cristobal could not independently suspend Plaintiff if not directed to do so by Administrator Barnes.

50.     That same night, the Aurora Police Department contacted Plaintiff about the patient's allegations.

51.     Plaintiff openly and fully cooperated with the Aurora Police Department's request for information.

52.     As a result of this contact, Plaintiff was never arrested for or charged with sexual or physical assault of the patient, much less ever contacted and questioned again by the Aurora Police or Adult Protective Services.

53.     Instead, the patient, shortly after Plaintiff was escorted from the property, was transported to a local hospital for a full psychiatric evaluation by qualified licensed professionals.

54.     Rather than consulting with qualified hospital staff about the thorough and professional psychiatric evaluation they performed or anything else that may have been contributing to patient's altered mental status, Defendants instead prolonged Plaintiff's suspension without pay and then prematurely and impulsively terminated her.

55.     On December 2, 2022, Director Barnes, on behalf of Defendants, filed a written complaint against Plaintiff with the Colorado Board of Nursing.

56.     Just six days after alleging that patient purportedly stated that Plaintiff had "raped" her, Administrator Barnes, on behalf of Defendants, now admitted in her complaint to the Colorado Board of Nursing that "the facility" had no reason to "believe that [a] sexual encounter occurred."

57.     Instead, and without any evidence whatsoever, Director Barnes insisted that Plaintiff

was "too rough" with the patient.

58. In this written complaint against Plaintiff, Administrator Barnes admitted that there were no witnesses to Plaintiff allegedly being "rough" with the patient.

59. In summary, at the time Administrator Barnes, on behalf of Defendants, ordered that Plaintiff be escorted out of the Life Care Center of Aurora facility:

• knew that Plaintiff had made at least four very serious complaints against Administrator Barnes' longstanding friend and colleague, RN Moeller, with regard to how she created a very hostile workplace environment for Plaintiff and coworkers, as well as for patients and their families, though failed to take any action against RN Moeller;

• knew that the "rape" allegation was false and in fact retracted it just days later in the complaint she filed against Plaintiff with the Colorado Board of Nursing, yet pretextually relied upon it as grounds to immediately suspend Plaintiff and escort her out of the facility;

• knew the patient who made this allegation had an extensive psychiatric history and also knew that the patient had refused ordered medications to treat her psychiatric disorders that entire day and throughout the prior week;

• knew the patient had undergone two intensive physical examinations which had not revealed any evidence of physical or sexual abuse; and

• knew that, in relation to the above, a day shift nurse had in fact obtained a Physician's Order hours before Plaintiff even arrived for work that day to send the patient to a hospital ER for a thorough and extensive psychiatric evaluation conducted by qualified professionals, yet decided to effectively suspend Plaintiff immediately after the patient made the false allegation.

60. Over *three months later*, on February 23, 2023, Plaintiff received from Defendants a formal notice of termination in a FedEx envelope postmarked December 27, 2022, which also included an *unsigned* check for "PTO" in the amount of $186.82.

61. Between being escorted out of the facility on November 26, 2022 and February 23, 2023, Plaintiff received no substantive information about either the status of the "investigation" or her employment status with Defendants.

62. Although the "Termination Form" admitted that Plaintiff had not sexually assaulted the patient, it stated – without any evidence or witnesses – that Plaintiff was "rough" with the patient.

63. The formal notice of termination received by Plaintiff on February 23, 2023, which was drafted by Administrator Barnes and Interim Director of Nursing Leia Blackwood and shared with Regional Executive Vice President ("VP") Scott Dabell, is rife with conflicting dates, misleading statements, and falsehoods, including:

- being dated "12/23/22" at the top by Interim Director of Nursing Blackwood and "12/23/22" beside the signature line at the bottom by Administrator Barnes, even though the date following "Date Termination Effective" was noted as "12/15/22", in addition to the FedEx envelope being postmarked "December 27, 2022";

- falsely noting that Administrator Barnes was "unable to contact" Plaintiff when she had in fact texted Plaintiff on December 14, 2022 about not clocking out for breaks and when Regional Executive Vice President Scott DaBell had in fact spoken on the phone with Plaintiff for at least 45 minutes on December 23, 2022;

- misleadingly stating that Plaintiff did not mention in the three-page handwritten statement she gave to Social Services Director Lindsey Cristobal immediately after being informed of the purported "rape" allegation on November 26, 2022 that she performed a skin assessment on the patient, which: (1) would not have been unusual given that every day and evening shift nurse is required to perform a skin assessment on each and every assigned patient each and every shift; (2) was done on November 25, 2022 while Plaintiff was speaking with patient's husband, as nurse aides were, at the same time, changing patient's soiled garments;

and (3) was mentioned during Plaintiff's phone call with the Aurora Police Department on November 26, 2022;

•       stating on the December 23, 2022 "Termination Form," that Regional Executive VP DaBell had been notified, even though Mr. DaBell did not mention anything about Plaintiff being terminated, much less her employment status, during an extensive phone conversation with Plaintiff on December 23, 2022.

64.     As Plaintiff had feared and had expressed during her meeting with Staff Development Coordinator Blackwood, Human Resources Director Landaverry, and Staffer Cherie Banks during her October 3, 2022 meeting, Administrator Barnes retaliated against Plaintiff for reporting on at least four occasions the belligerent and hostile and discriminatory conduct of her longstanding friend and colleague, RN Moeller, by knowingly terminating Plaintiff on false grounds and based upon the purported allegation of a mentally and emotionally and physically fragile psychiatric patient who had been, for approximately one week, refusing her psychotropic medications.

65.     After the Colorado Board of Nursing conducted a thorough investigation of Plaintiff based upon Administrator Barnes's December 2, 2022 complaint, on February 3, 2023, the Board of Nursing informed Plaintiff that it was closing and dismissing the case after finding no evidence of any misconduct.

66.     At all times relevant to this action, Administrator Barnes was working as an agent of or on behalf of Defendants.

67.     The actions of Administrator Barnes are, therefore, the actions of Defendants.

68.     Defendants terminated Plaintiff in response to Plaintiff raising serious – and protected – concerns about RN Moeller, who is a longstanding friend and colleague of Director Barnes.

69.     Defendants' decision to suspend Plaintiff based upon the unsubstantiated allegations of a patient with known, extensive, and documented psychiatric issues, as well as the decision to

conveniently change the substance of those allegations from "rape" to being too "rough" when the initial allegations were clearly not meritorious, demonstrates clear pretextual grounds to terminate Plaintiff.

70. Defendants also proceeded with Plaintiff's termination, which was not actually received until February 2023, despite the Aurora Police Department expressly determining that the case would be "inactivated at this time **due to no claims or evidence of criminal activity[.]**" APD's investigating officer further concluded that "it did not sound like a sexual assault [occurred] and with no evidence of criminal activity and no claims of criminal activity," APD could "not move forward with a criminal case."

71. Defendants' own Code of Conduct protects the precise type of complaints Plaintiff legitimately raised against RN Moeller, including when the Code of Conduct states:

- "[Associates such as Plaintiff] are free to express their ideas and concerns and are encouraged to participate in, and feel a part of, the organization."

- Management must "believe in fair and consistent application of the rules, policies, and procedures of the corporation."

- "If at any time associates have questions concerns, or suggestions about work, policies, or overall operations off the facility, they should feel free to discuss them with their supervisors."

- "We believe in the dignity of each individual and strive to treat every associate with respect and openness. Direct communications between associates and supervisors have resulted in better understanding and more rapid solutions to challenges[.]"

- "If associates have questions or concerns about working conditions or compensation, they are strongly encouraged to talk openly and directly with their supervisors."

- "[I]t is our policy to provide an environment that is free of unlawful harassment and retaliation."

- "**Life Care encourages reporting of all perceived incidents of discrimination or harassment**. It is the policy of the company to promptly and thoroughly investigate such reports. **Life Care prohibits retaliation against any individual who reports discrimination or harassment** or participates in an investigation of such reports." (Emphasis added.).

72. In retaliating against Plaintiff in order to protect the relationship between Defendant Barnes and RN Moeller (while also failing to discipline RN Moeller for her conduct involving patients, discrimination against other employees, and emotional outbursts and other unprofessional conduct against colleagues such as Plaintiff), Defendants also violated the Code of Conduct's prohibition on conflicts of interest.

73. Defendants' Code of Conduct repeatedly encourages Plaintiff to express concerns regarding RN Moeller to her "supervisor or Executive Director or anyone from Human Resources[,]" which Plaintiff did on at least four occasions.

74. The Code of Conduct further states that Defendants will be "readily available and receptive to complaints of harassment and discrimination." If, after confronting the harasser, the harassment or discrimination does not stop, the employee "should immediately contact their supervisors," which, as alleged above, Plaintiff did.

75. Finally, Defendants maintain a robust anti-retaliation policy:

The company **will not in any way retaliate against an associate** . . . who, in good faith, **makes a complaint or report of unlawful harassment or discrimination** or participates in an investigation of such a complaint or report. **Retaliation against any individual who reports** or cooperates in the investigation **is not tolerated and will result in the appropriate corrective action**."

(Emphasis added.)

76. However, Defendants did retaliate against Plaintiff for making repeated, good faith, and credible concerns about RN Moeller because RN Moeller maintained a longstanding personal and professional relationship with Administrator Barnes.

77. As alleged above, after reporting the above-mentioned ethical and compliance concerns, Defendants retaliated against Plaintiff by terminating her.

78. The public has a strong interest in protecting Plaintiff's ability to raise these concerns, as Defendants' own internal policies encourage and, in fact, require the reporting of ethical and compliance concerns such as those Plaintiff raised and further prohibit any retaliation, including discharge, against an employee such as Plaintiff for reporting such concerns.

## FIRST CLAIM FOR RELIEF

### Wrongful Discharge in Violation of Public Policy

79. Plaintiff incorporates herein by this reference the allegations contained above, as if set forth *verbatim*.

80. Defendants wrongfully, willfully, and intentionally terminated Plaintiff for protected acts, including reporting serious and meritorious harassment, discrimination, and other professional issues about RN Moeller.

81. Defendants retaliated against Plaintiff for making these ethical and compliance reports.

82. During the course of Plaintiff's employment with Defendants, Defendants prevented Plaintiff from exercising these important work-related rights or functions including raising meritorious concerns about harassment, discrimination, and patient mistreatment.

83. Plaintiff refused to cease raising her concerns because Plaintiff reasonably believed that doing so would have been a violation of internal human resources policies and a violation of Plaintiff's legal rights and privileges as a worker.

84. Defendants discharged Plaintiff because she refused to cease raising legitimate concerns about RN Moeller's performance. In fact, Defendants did so the day after RN Moeller was involved in yet another major patient safety incident.

85. The termination of Plaintiff for the actions that she took was a violation of public policy as Defendants' own internal policies require the types of reports and complaints Plaintiff made as well as prohibit retaliation against Plaintiff for making such reports.

86. The termination of Plaintiff violates an implied contractual provision within the employment relationship with Plaintiff that exists through the operation of law and Defendants' own, internal employment policies.

87. As a direct and proximate result of the wrongful actions taken against Plaintiff by Defendants, Plaintiff has been damaged and is entitled to recover all damages available under Colorado law.

## SECOND CLAIM FOR RELIEF

### Breach of Contract

88. Plaintiff incorporates herein by this reference the allegations contained above, as if set forth *verbatim.*

89. In promulgating the above-quoted human resources policies, Defendants limited their power to discharge certain personnel, including Plaintiff, by promulgating and issuing such policies.

90. In promulgating the above-quoted human resources policies, Defendants were making an offer to Plaintiff.

91. Defendants manifested their willingness to enter into a bargain in such a way as to justify Plaintiff in understanding that her assent to the bargain was invited by Defendants and that Plaintiff's assent would conclude the bargain.

92. Plaintiff's initial and continued employment constituted acceptance of and consideration for the termination procedures discussed in the above-quoted human resources policies.

93. In issuing such policies, Defendants chose to convey to employees such as Plaintiff that their personnel policies and practices are fair and are to be applied consistently and uniformly to each employee, including Plaintiff.

94. As a result of the above, a contract existed between the parties.

95. The contract is a valid contract as it was accompanied by lawful offer, acceptance, and consideration.

96. There are no valid defenses to the formation of the contract.

97. Defendants breached the contract when they, amongst other actions, terminated Plaintiff in violation of the contract's anti-retaliation provisions.

98. Plaintiff has been damaged by Defendant's breaches and is entitled to recover all damages available under Colorado law.

### THIRD CLAIM FOR RELIEF

### Promissory Estoppel

99. Plaintiff incorporates herein by this reference the allegations contained above, as if set forth *verbatim*.

100. In promulgating the above-quoted human resources policies, Defendants did expect or reasonably expected Plaintiff to consider the policies as a commitment from Defendants to follow the termination procedures and limitations on termination discussed therein.

101. These policies specifically encouraged disclosure of harassment, discrimination, and patient mistreatment concerns.

102. Plaintiff, in making the repeated, written, and increasingly urgent disclosures, relied upon the anti-retaliation limitations contained therein, including the express policies prohibiting termination for making such disclosures.

103. Plaintiff considered the human resources policies as a commitment from Defendants to follow the termination procedures and limitations on termination discussed therein.

104. Plaintiff, in making the disclosures she did, which she did because the policies prohibited retaliation including discharge, reasonably relied on the human resources policies.

105. Defendants, in promulgating the internal human resources policies, should have reasonably expected to induce action on Plaintiff's part, including, but not limited to, speaking up with legitimate concerns about discrimination, harassment, and patient mistreatment without fear of retaliation.

106. Defendants' internal human resources did induce such action, as Plaintiff repeatedly reported her concerns about RN Moeller and did so because Defendants' policies prohibited retaliation against Plaintiff for raising such concerns.

107. Plaintiff has incurred damages as a result of her reliance on Defendants' human resources policies.

108. Injustice can be avoided only by enforcement of Defendants' termination procedures and human resources policies.

**FOURTH CLAIM FOR RELIEF**

**Breach of Implied Contract Based Upon Violations of Employer's Termination Policies or Procedures**

109. Plaintiff incorporates herein by this reference the allegations contained above, as if set forth *verbatim*.

110. Defendants had numerous human resources policies, quoted above, which were in effect at the time Plaintiff was discharged by Defendants.

111. The policies set forth procedures and protections regarding the discharge of Defendants' employees, such as Plaintiff.

112. Defendants demonstrated to such employees, including Plaintiff, a willingness to be bound by such policies and procedures.

113. Plaintiff was aware of the existence of the human resources policies and procedures before he was discharged by Defendants.

114. Plaintiff reasonably understood that Defendants were offering the human resources policies as part of the terms and conditions of her employment with Defendants and, with that understanding, Plaintiff both began and continued her employment with Defendant.

115. Defendants discharged Plaintiff without complying with the policies and procedures set forth in its human resources policies.

116. Until discharged, Plaintiff performed or substantially performed her part of the contract.

**WHEREFORE,** the Plaintiff, Diane Doumit, prays for judgment against Defendants Arapahoe Medical Investors, LLC and Life Care Center of Aurora, Corp. in an amount to be determined by the trier of fact for her losses as set forth above and for costs, attorneys' fees, expert witness fees, filing fees, pre- and post-judgment interest, and such other further relief as the Court deem appropriate, just, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. Pro. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: May 19, 2023

Respectfully submitted,

*/s/ Elliot A. Singer*
Elliot A. Singer (#47490)
CONDUIT LAW, LLC
1660 Lafayette St.
Suite 4
Denver, CO 80218
Phone: (720) 432-7032
Facsimile: (720) 310-2224
Email: elliot@conduit.law
*Counsel for Plaintiff*

Plaintiff's Address:
13941 East Harvard Ave.
Unit 271
Aurora, CO 80014